TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00004-CV






Charly Publishing Limited and Charly Acquisitions Limited, Appellants



v.



Evelyn Kynard Erickson, in her Capacities as Attorney-in-Fact for Roky Erickson and
Trustee of the Roky Erickson Trust
, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT


NO. 93-07292, HONORABLE CHARLES F. CAMPBELL JR., JUDGE PRESIDING







 Appellants, Charly Publishing Limited and Charly Acquisitions Limited, appeal a
discovery sanction order and the denial of appellants' special appearances. We will affirm both
orders.


BACKGROUND

 In the 1960s, Austin musician Roky Erickson and his band, the 13th Floor
Elevators, entered into a recording contract in Texas with Texas-based International Artists
Producing Corporation ("International Artists") and a songwriter's contract with Texas-based
Tapier Music Corporation ("Tapier"). The contracts granted International Artists the exclusive
right to produce and distribute records and tapes of music performed by Erickson and the other
band members and granted Tapier the exclusive right to license, exploit, and collect royalties in
connection with songs composed by Erickson. The contracts obligated both companies to account
to and pay royalties to Erickson and the other band members. In 1978, Lelan Rogers ("Rogers"),
a former employee of International Artists, bought all the outstanding shares of stock of both
International Artists and Tapier, acquiring both the publishing interests and master recordings of
certain 13th Floor Elevators' songs.

 In 1993, Evelyn Kynard Erickson ("Erickson"), in her capacity as Attorney-in-Fact
for Roky Erickson and as Trustee of the Roky Erickson Trust, filed suit in Austin, Texas, against
Rogers and others seeking both damages for alleged unpaid royalties and rescission of the
recording and songwriter's contracts previously entered into with International Artists and Tapier. 

 On April 1, 1995, with Erickson's suit proceeding, Rogers entered into a contract
in California with Charly Publishing Limited ("Charly Publishing"), an English company, whereby
Charly Publishing purchased the songwriter's contracts from Rogers. In the purchase agreement,
Charly Publishing expressly acknowledged that it was aware of Erickson's suit against Rogers in
Austin, Texas. On the same day, Charly Holdings, Inc. ("Charly Holdings"), a Panamanian
company, entered into a substantially similar purchase contract with Rogers in which Charly
Holdings purchased the recording contracts from Rogers.

 Charly Holdings subsequently sold its interest in the 13th Floor Elevators' music
to Etablissement Anfra ("Anfra") of Liechtenstein on June 1, 1995. On January 11, 1996, Anfra
sold its interest in the music to Charly Acquisitions Limited ("Charly Acquisitions"), an Irish
company. Erickson accordingly joined both Charly Publishing and Charly Acquisitions ("the
Charly companies") in the original suit.

 Erickson served process and requests for disclosures on Charly Publishing on
January 27, 1999 and on Charly Acquisitions on February 4, 1999. The Charly companies filed
special appearances on March 1, 1999. Erickson served both companies with requests for
production on March 31, 1999 and with interrogatories on April 2, 1999. On April 29, 1999, the
Charly companies requested additional time to respond to discovery. Counsel for both parties
entered into a written agreement whereby the Charly companies would have until May 6, 1999 to
file objections to discovery and until May 13, 1999 to produce responses to discovery.

 On May 6, 1999, the Charly companies filed objections to Erickson's requests for
production and interrogatories. The trial court overruled these objections at a hearing on May 17,
1999. Pursuant to Rule 193.4 of the Texas Rules of Civil Procedure, the Charly companies were
required to produce responsive documents and answer all interrogatories within thirty days after
the court's ruling. See Tex. R. Civ. P. 193.4. Erickson wrote to the Charly companies after the
May 17th hearing requesting that they respond to the discovery requests. After receiving no
responses, Erickson filed, on July 15, 1999, a motion to compel and a motion for sanctions. A
hearing was set for August 3, 1999. On August 2, 1999, the Charly companies responded to the
requests for disclosure. On August 3, the day of the hearing, the Charly companies responded to
the requests for production for the first time. The companies did not respond to any of the
interrogatories.

 At the August 3rd hearing, the trial court ordered the Charly companies to fully and
completely respond to Erickson's discovery requests, sanctioned the companies by assigning
attorney's fees against them, and warned the companies that if they failed to deliver full and
complete answers within ten days, the following fact would be established as true: "Defendant
Charly Publishing Limited and Defendant Charly Acquisitions Limited have engaged in business
contacts in Texas sufficient to confer this Court with in personam jurisdiction over both
Defendants in this action."

 The Charly companies tendered responses to Erickson's discovery requests on
August 13, 1999. Dissatisfied with the responses, Erickson filed a second motion to compel and
a motion for sanctions on August 27, 1999. The second motion to compel was heard on
September 21, 1999. Immediately before the hearing, counsel for both parties entered into a
written agreement wherein the Charly companies agreed to answer certain discovery requests
within a specified time. At the hearing, the trial court determined that the responses previously
filed by the Charly companies were not full and complete as required by the previous court order. 
As warned, the trial court sanctioned the companies by finding as fact that both companies
engaged in business contacts in Texas sufficient to confer the court with in personam jurisdiction. 
The trial court signed the order on October 6, 1999. This order formed the basis of the Charly
companies' initial appeal.

 On December 13, 1999, another hearing was held in which the Charly companies'
special appearances were overruled. From the evidence presented at the hearing, separate from
its earlier sanction, the trial court made the same factual determination: that Charly Acquisitions
and Charly Publishing have business contacts in Texas sufficient to confer the court with in
personam jurisdiction over both companies. The Charly companies now appeal the trial court's
imposition of the discovery sanction, the court's denial of their special appearances, and the factual
determination resulting from both actions, arguing that Charly Publishing and Charly Acquisitions
do not have business contacts in Texas sufficient to confer the court with in personam jurisdiction
over the companies.


DISCUSSION

 Discovery sanctions are not appealable until the trial court renders a final judgment. 
Bodnow Corporation v. City of Hondo, 721 S.W.2d 839, 840 (Tex. 1986). However, when the
trial court overruled the Charly companies' special appearances, it rendered an appealable
interlocutory order. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2000). 
The trial court's factual determination underlying the denial of the special appearance is identical
to that of the earlier discovery sanction: that the Charly companies engaged in business contacts
in Texas sufficient to confer the court with in personam jurisdiction over the companies. Had the
trial court chosen a different sanction or had the sanction encompassed another subject matter, the
sanction order would not yet be appealable to this Court absent specific authorization. Further,
the record makes clear that the trial court based its special appearance ruling on the evidence
presented at the hearing and not on its earlier sanction. Because the factual bases of the two court
orders are identical and because the court can entertain an interlocutory appeal of the special
appearance order, this Court will review that portion of the discovery sanction resulting in the
factual determination alongside the denial of the companies' special appearances.(1)

Standard of Review

 A defendant who challenges a court's exercise of personal jurisdiction through a
special appearance carries the burden of negating all bases of personal jurisdiction. Kawasaki
Steel Corp. v. Middleton, 699 S.W.2d 199, 203 (Tex. 1985); Siskind v. Villa Found. for Educ.,
Inc., 642 S.W.2d 434, 438 (Tex. 1982). When a trial court overrules a special appearance, the
defendant should request the court to make findings of fact according to Texas Rule of Civil
Procedure 296. See Tex. R. Civ. P. 296; Runnells v. Firestone, 746 S.W.2d 845, 848 (Tex.
App.--Houston [14th Dist.] 1988, writ denied). Absent such findings, we view the trial court's
judgment as impliedly finding all the necessary facts to support its ruling. See Worford v.
Stamper, 801 S.W.2d 108, 109 (Tex. 1990). The Charly companies made no request for findings
of fact from the trial court, and none were filed. We therefore presume that the trial court made
all necessary findings to support its order. See id. If evidence supports the implied findings of
fact, we must uphold the trial court's judgment on any legal theory supported by the evidence. 
See id. 

 When in personam jurisdiction is challenged, we review all the evidence. See Smith
v. Lanier, 998 S.W.2d 324, 330 (Tex. App.--Austin 1999, pet. denied). We apply a factual
sufficiency standard in reviewing the evidence, not a de novo review. See id. We may reverse
the decision of the trial court only if its ruling is so against the overwhelming weight and
preponderance of the evidence as to be clearly erroneous and manifestly unjust. See Cain v. Bain,
709 S.W.2d 175, 176 (Tex. 1986).


In Personam Jurisdiction

 A Texas court may exercise jurisdiction over a nonresident defendant when the
Texas long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction
comports with due process. Guardian Royal Exch. Assurance, Ltd. v. English China Clays,
P.L.C., 815 S.W.2d 223, 226 (Tex. 1991); see also Tex. Civ. Prac. & Rem. Code Ann. § 17.042 
(West 1997). Our long-arm statute authorizes the exercise of jurisdiction over those who do
business in Texas. Guardian Royal, 815 S.W.2d at 226. The supreme court has determined that
the broad language of the long-arm statute permits an expansive reach of jurisdiction, limited only
by the federal constitutional requirements of due process. Id. As a result, we consider whether
it is consistent with federal constitutional requirements of due process for Texas courts to assert
in personam jurisdiction over the Charly companies. See id.

 Under the federal constitutional test of due process, a state may assert personal
jurisdiction over nonresident defendants where (1) the defendants have purposefully established
"minimum contacts" with the forum state and (2) the exercise of jurisdiction comports with "fair
play and substantial justice." Burger King Corp. v. Rudzewicz , 471 U.S. 462, 475-76 (1985).


Minimum Contacts

 The ultimate test of minimum contacts is whether the defendants purposefully
availed themselves of the privilege of conducting activities in Texas, thereby invoking the benefit
and protection of Texas laws. Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990). Those
activities, whether they consist of direct acts within the forum or conduct outside the forum, must
justify a conclusion that the defendants should reasonably anticipate being called into Texas. Id. 
Foreseeability is thus an important consideration in deciding whether the nonresident defendants
have purposely established minimum contacts with the forum state. Guardian Royal, 815 S.W.2d
at 227.

 The minimum contacts analysis has further been refined into two types of
jurisdiction, specific and general. Specific jurisdiction exists when the cause of action arises out
of or relates to the nonresident defendants' contacts with the forum state. Id. The nonresident
defendants' activities must have been purposefully directed toward the forum state. Id. at 228. 
Under specific jurisdiction, the minimum contacts analysis focuses on the relationship among the
defendants, the forum, and the litigation. Id. General jurisdiction exists when the defendants'
contacts with the forum state are continuous and systematic, even if the cause of action does not
arise from or relate to activities conducted within Texas. Id. Generally, the effort to establish
general jurisdiction is more demanding, requiring a showing of the defendants' substantial
activities within the forum state. Schlobohm, 784 S.W.2d at 357. We analyze the present case
under both types of jurisdiction.

 The Charly companies argue that they do not have minimum contacts with Texas
sufficient to subject them to in personam jurisdiction within the state, emphasizing that they are
foreign corporations based in Ireland and the Channel Islands, and that they are not registered to
do business in Texas, do not own property in Texas, have no employees, assets, or offices in
Texas, and have not sought to avail themselves of the protections afforded under the laws of
Texas. However, minimum contacts with a state for personal jurisdiction purposes need not
always arise from actual physical activity of the defendant in the forum state. Activities taking
place in other states or countries which entail foreseeable effects in the forum state may be
sufficient to satisfy the minimum contacts requirement. See Western Desert, Inc. v. Chase
Resources Corp., 460 F. Supp. 63, 65 (N.D. Tex. 1978). The record establishes that the Charly
companies engaged in numerous activities, the foreseeable effects of which satisfy the minimum
contacts requirement. 

 Pursuant to the original recording and songwriter's contracts, International Artists
and Tapier were obligated to provide notices, twice-yearly written accountings, and royalties to
Erickson and other band members at their addresses in Texas. By purchasing the outstanding
shares of International Artists and Tapier, Rogers assumed these obligations. When Rogers
entered into the agreements with Charly Publishing and Charly Holdings, both companies signed
identical contracts with Rogers. Article 6.2 of the contracts states that both Charly Publishing and
Charly Holdings undertook "to fulfil all [Rogers'] obligations first arising after the date hereof
pursuant to the Acquisition Agreements as if [Charly Publishing and Charly Holdings] [were] a
direct party to such agreements." Under the agreement, the companies expressly assumed all
responsibilities under the former contracts, including the obligation to pay royalties and make
accountings. The contracts between Rogers on the one hand, and Charly Publishing and Charly
Holdings on the other, also contained identical provisions obligating the companies "to pay any
and all royalties due to the Assignors and all other third parties participating pursuant to the
Acquisition Agreements in respect of phonograph records sold and/or any and all other
exploitation of the Compan[ies] and or [their] licenses." When Charly Acquisitions subsequently
assumed the contract Charly Holdings originally entered into, Charly Acquisitions became subject
to the common law maxim that "an assignee stands in the shoes of his assignor." Jackson v.
Thweatt, 883 S.W.2d 171, 174 (Tex. 1994). Charly Acquisitions thus became responsible for
Charly Holdings' contractual obligations. The record also reveals that the Charly companies have,
in fact, sent accountings to band members located throughout Texas.

 The Charly companies rely on U-Anchor Adver., Inc. v. Burt, 553 S.W.2d 760
(Tex. 1977), cert. denied, 434 U.S. 1063 (1978), to argue that minimum contacts may not be
satisfied by a party merely making payments or sending royalties to the forum state. In that case,
a Texas business, U-Anchor, installed highway signs in Oklahoma and the Oklahoma customer
sent monthly payments to U-Anchor's office in Texas. U-Anchor Adver., Inc., 553 S.W.2d at
761. The Texas Supreme Court held that the Oklahoma customer's single act of mailing payments
to Texas was not enough to satisfy the due process requirement of minimum contacts. Id. at 763. 
If the only contact the Charly companies had with Erickson was sending royalty payments to
Erickson in Texas, the present case might be more analogous to U-Anchor Advertising. However,
the Charly companies had other contacts, in addition to the obligation to send royalties and
accountings, that collectively satisfy the minimum contacts requirement.

 Where nonresident defendants have only a single contact or activity tying them to
the forum state, minimum contacts may be absent. But with each additional contact, the analysis
changes. This Court has sustained a finding of sufficient minimum contacts with Texas where the
nonresident defendant had two purposeful contacts. See Rowland & Rowland, P.C. v. Texas
Employers Indem. Co., 973 S.W.2d 432, 436 (Tex. App.--Austin 1998, no pet.). In Rowland &
Rowland, in addition to sending a payment from a wrongful death judgment to Texas residents,
the nonresident law firm sent a letter to the Texas Employers Indemnity Company confirming that
the firm would protect the company's interest in continuing litigation, eliminating the necessity
of the company being added to the suit. Id. at 435-36. This Court found that the nonresident
defendant's promise to protect the company's interest in Texas and the distribution of proceeds
in Texas were sufficient purposeful minimum contacts with this state to satisfy due process. Id.
at 436. As in Rowland & Rowland, the record here contains evidence of contacts of substantial
quality to establish minimum contacts.

 In addition to obligating themselves to make royalty payments and accountings to
Texas residents, the Charly companies acquired the recording and songwriter's contracts knowing
they were the subject matter of litigation in Texas. As successors to Rogers' interest, the Charly
companies acquired that interest knowing it was subject to disputed litigation. Section 3.6 of the
assignment contracts drafted by the Charly companies for Rogers states, in part:


Company [Charly companies] is aware that proceedings have been issued against
you [Rogers] by Roky Erickson and others in Austin, Texas ("the Proceedings")
claiming that you do not own and/or control any rights . . . . You hereby
undertake to defend the Proceedings to the best of your ability and not to settle or
compromise the Proceedings without the prior written consent of Company.



 The Charly companies argue that this section absolved the companies of any
involvement in the lawsuit. Yet, as the parties recognize, the provision does not prohibit or
protect the Charly companies from involvement in the lawsuit. Rather, it merely requires Rogers
to continue defense of the action. In fact, the provision clearly states that while Rogers would
remain primarily responsible for the defense, the Charly companies would nevertheless take at
least an indirect interest in the lawsuit by requiring Rogers to seek the Charly companies' approval
before settling or compromising the proceedings. Even if the Charly companies chose not to
become directly involved in the proceedings, which the contracts did not prohibit them from
doing, they nevertheless required Rogers, a party involved in a lawsuit in Texas courts, to gain
the approval of the Charly companies before resolving the Texas proceedings, thereby implicating
the Charly companies in availing themselves of the benefits and protections of the laws and judicial
system of the state.

 The Charly companies have also initiated contact in Texas with Texas residents,
in addition to Erickson, in attempts to settle and renegotiate the terms of the original recording and
songwriter's contracts. The Charly companies hired a Houston law firm to represent them and
contact former 13th Floor Elevators band members to renegotiate and confirm contract terms. 
Letters sent by the Houston firm offered advances against future royalties for confirmation of the
Charly companies' purchase and ownership of the 13th Floor Elevators' recordings. The Charly
companies also sent a solicitor representing them from Europe to Texas to enter into an agreement
with Noble Ginther, a former owner of International Artists and Tapier, confirming that Ginther
no longer claimed any interest in the musical rights of Erickson or the 13th Floor Elevators. In
business unrelated to either Erickson or the 13th Floor Elevators, the Charly companies also have
entered into contracts with other Texas musicians obligating the companies to deliver accountings
and payments on a regular basis to such musicians in Texas.

 The nature and quality of the Charly companies' contacts with Texas support the
trial court's finding of in personam jurisdiction. The Charly companies knew they were assuming
contracts negotiated in Texas that obligated them to send regular accountings and royalties to
Texas residents. The companies were likewise aware of the litigation in Texas before they took
assignment of such contracts, making it foreseeable that the companies would in some manner be
involved in the ongoing litigation. The Charly companies also utilized the benefits and protections
of Texas laws in soliciting, negotiating, and entering into agreements in Texas. We find it
difficult to understand how, given the evidence of such contacts, the Charly companies can assert
they have taken no action directed toward the forum state. We therefore hold that the Charly
companies' contacts with Texas satisfy the minimum contacts test of due process. Having
determined that the trial court's exercise of jurisdiction in these circumstances withstands a
minimum contacts analysis, we next determine whether this exercise comports with fair play and
substantial justice.


Fair Play and Substantial Justice

 Because the minimum contacts analysis includes many considerations of fairness,
once sufficient contacts are established the likelihood that the exercise of jurisdiction violates a fair
play analysis lessens. See Schlobohm, 784 S.W.2d at 357-58. We nevertheless consider the fair
play analysis because case law makes clear that it constitutes a separate and distinct issue from
minimum contacts. See id. at 358. In determining whether the assertion of personal jurisdiction
comports with fair play and substantial justice, we evaluate the nonresident defendants' contacts
in light of other factors, including (1) the burden on the defendants, (2) the interest of the forum
state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective
relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of
controversies, and (5) the shared interest of the several states in furthering fundamental substantive
social policies. See Guardian Royal, 815 S.W.2d at 228 (citing Burger King, 471 U.S. at 477). 
The defendant assumes the burden to show "a compelling case that the presence of some
consideration would render jurisdiction unreasonable." Id. at 231.

 Evidence relating to the factors for determining whether assertion of personal
jurisdiction over a nonresident defendant is fair and reasonable weighs against the Charly
companies. First, nothing in the record indicates that defending an action in Texas will unduly
burden the Charly companies. Distance alone is not ordinarily sufficient to defeat jurisdiction. 
Id. Over time, the Charly companies have sent at least one representative from England to Texas
and hired a Texas lawyer to engage in other contract negotiations; they have not demonstrated that
defending this action would be unduly more burdensome. Second, Texas has an interest in
adjudicating the dispute because the original contracts were executed here, the action was
originally filed here, and the laws of Texas will apply to the contracts' interpretation. Third, as
Texas residents, Roky Erickson and his mother, as Attorney-in-Fact, can obtain the most
convenient and efficient relief in Texas. Considering all of the above factors, we conclude that
requiring the Charly companies to submit to the jurisdiction of Texas courts does not offend
traditional notions of fair play and substantial justice.


CONCLUSION

 Having determined that the Charly companies established minimum contacts with
Texas and that the assertion of jurisdiction comports with fair play and substantial justice, we
overrule the Charly companies' points of error and affirm the trial court's discovery sanction and
denial of the Charly companies' special appearances.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Patterson 

Affirmed

Filed: October 5, 2000

Do Not Publish


1. We need not decide whether determining a jurisdictional fact adverse to a litigant is an
appropriate sanction in light of the trial court's finding based on an evidentiary hearing on the
matter.


ss unrelated to either Erickson or the 13th Floor Elevators, the Charly companies also have
entered into contracts with other Texas musicians obligating the companies to deliver accountings
and payments on a regular basis to such musicians in Texas.

 The nature and quality of the Charly companies' contacts with Texas support the
trial court's finding of in personam jurisdiction. The Charly companies knew they were assuming
contracts negotiated in Texas that obligated them to send regular accountings and royalties to
Texas residents. The companies were likewise aware of the litigation in Texas before they took
assignment of such contracts, making it foreseeable that the companies would in some manner be
involved in the ongoing litigation. The Charly companies also utilized the benefits and protections
of Texas laws in soliciting, negotiating, and entering into agreements in Texas. We find it
difficult to understand how, given the evidence of such contacts, the Charly companies can assert
they have taken no action directed toward the forum state. We therefore hold that the Charly
companies' contacts with Texas satisfy the minimum contacts test of due process. Having
determined that the trial court's exercise of jurisdiction in these circumstances withstands a
minimum contacts analysis, we next determine whether this exercise comports with fair play and
substantial justice.


Fair Play and Substantial Justice

 Because the minimum contacts analysis includes many considerations of fairness,
once sufficient contacts are established the likelihood that the exercise of jurisdiction violates a fair
play analysis lessens. See Schlobohm, 784 S.W.2d at 357-58. We nevertheless consider the fair
play analysis because case law makes clear that it constitutes a separate and distinct issue from
minimum contacts. See id. at 358. In determining whether the assertion of personal jurisdiction
comports with fair play and substantial justice, we evaluate the nonresident defendants' contacts
in light of other factors, including (1) the burden on the defendants, (2) the interest of the forum
state in adjudicating the dispute, (3) the p